Filed 3/27/15  In re Z.W. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Z.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E062090 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J246776 & J246777) |
| v. | OPINION |
| W.J. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  A. Rex Victor, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant, W.J.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant, J.W.

1

Jean-Rene Basle, County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

Sisters Z.T.W. (age seven) and Z.E.W. (age three) are subjects of this dependency. Their brothers, D.J. (age nine) and J.W., Jr. (age two), are also dependent children. Father and appellant J.W. (Father) is the presumed father of the sisters.[1] Mother and appellant W.J. (Mother) is the mother of all four children.

On appeal, Mother and Father challenge the juvenile court's denial of their petitions under Welfare and Institutions Code[2] 388, and the termination of their parental rights by the juvenile court under section 366.26 on October 9, 2014. For the reasons set forth below, we shall affirm the trial court's order denying the section 388 petitions and judgment terminating both Mother's and Father's parental rights.

---

[1] Father is also the presumed father of J.W., Jr., and the stepfather of D.J.
[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

II

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

A. *Case No. E058012*

In our unpublished opinion in *W. J. v. Superior Court* (May 9, 2013, E058012) [nonpub. opn.], we provided the following factual and procedural background:

"The children came to the attention of the San Bernardino County Children and Family Services (CFS) on November 8, 2012, when then seven-year-old D.J. was complaining of pain to his hands, arms, chest, and leg at school. D.J. reported that his stepfather, J.W., had beat him with an electric cord the previous night for getting in trouble for stealing food from another student at school. The beating resulted in the child suffering from numerous lacerations, welts, and bruises to his arms, legs, back, buttocks, stomach, and chest. J.W. threatened to beat the child more severely if the child did it again. After the beating, the child was sent to bed without dinner, and he was not given breakfast the following morning despite the fact that the child had been trying to get food at school. D.J. indicated that he often did not get food at home; school personnel noted that there had been times D.J. had taken food and appeared as though he had not been fed at home.

D.J. also stated that Mother was in another room when he was being beaten by J.W., and Mother did not come in during the beating or check on him after he was beaten. D.J. further disclosed that Mother had also beaten him in the past with a piece of a broken dresser drawer, and on another occasion with a belt, resulting in a cut to his head and blood gushing from his scalp. After the beating, Mother made the child clean up the

3

spilled blood. D.J. also stated that he had seen Mother and J.W. beat his then five-year-old half-sister Z.W. with a belt and an electric cord.[3] D.J. further reported that he had seen domestic violence between his mother and J.W. Z.W. confirmed that D.J. had been beaten by J.W. She also confirmed that her parents had hit her with a belt on the buttocks and back.

All three children were subsequently taken to an emergency room for evaluation and treatment. D.J. reported that J.W. beat him with an extension cord and that Mother hit him with a belt. He also stated that Mother had seen J.W. with the extension cord and had heard him crying during the beating. D.J. had multiple lacerations, bruises, and welts all over his body, and there were numerous older injuries on his body that were consistent with belt or extension cord lacerations. The treating doctor reported that she had found severe contusions, too numerous to document, on D.J.; that D.J. had defensive wounds on his hands; and that the lacerations and hematomas on D.J. would leave scars. The doctor also noted that D.J.'s injuries were inflicted on top of older injuries and were so extensive that they covered up some evidence of prior injuries. The doctor concluded D.J.'s injuries were clearly the result of child abuse. The two younger children had no visible injuries.

When police officers contacted Mother, Mother lied to the police, claiming that J.W. was her brother, that she was not at home during the beating, and that she did not know the child was being beaten by J.W. She also stated that she did not see any injuries

---

[3] J.W. is the father of Z.W. and her 17-month-old sister. J.W. is not a party to this appeal.

4

on D.J. or notice that D.J. appeared to be in pain. Z.W., however, reported that Mother was in the living room while J.W. was beating D.J. Mother further denied beating any of the children. The police searched the home and found an extension cord that was covered in a red substance, believed to be blood. They also found blood on a pillow on D.J.'s bed, on a towel in the bathroom, and smeared on the wall. The police also interviewed a neighbor who reported that she had seen Mother hitting the children with a belt, a tree twig, and grabbing them by the hair to slap them on numerous occasions.

J.W. and Mother were arrested for child endangerment. J.W. admitted at the police station that he had beaten D.J. with an electric cord due to the child's ongoing behavioral issues. J.W. believed the child may have Attention Deficit Hyperactivity Disorder (ADHD). Mother continued to deny knowing anything about D.J.'s injuries, claiming they discipline the children by making them do chores. Mother also stated that they had been having problems with D.J.'s behavior issues and that the child had been diagnosed with ADHD. After seeing D.J.'s injuries, Mother later agreed that the injuries were excessive.

On November 13, 2012, CFS filed petitions on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (c) (serious emotional damage), (g) (no provision for support), and (j) (abuse of sibling). The children were formally detained at the detention hearing and placed in a foster home. The parents were provided with supervised visitation upon release from custody, and ordered to submit to random drug testing. The parents were also informed that they might not be provided with reunification services pursuant to section 361.5.

In a jurisdictional/dispositional report, the social worker recommended that the allegations in the petition be found true, that no reunification services be provided to the parents, and that a section 366.26 hearing be set. The social worker noted that Mother had minimized and lied about the discipline of D.J.; that she lied about J.W.'s identity to the police; and that she gave conflicting statements about her whereabouts when J.W. beat D.J. Mother denied any history of domestic violence; however, the social worker found evidence showing that Mother had been a victim in a domestic violence case against J.W. and that J.W. had an order to stay away from Mother. The social worker further pointed out that the abuse was severe and ongoing, and that although D.J. appeared to be the primary target, there were consistent reports that Mother had hit Z.W. as well. In addition, both parents were surprised about being arrested for child abuse, indicating to the social worker that they believed in inflicting physical abuse as a form of discipline; they appeared to be only concerned about being arrested, and did not show any concern about D.J. Neither parent had asked how D.J. was doing or about his medical condition. The social worker believed that returning the children to the parents' care would be detrimental given the seriousness of the abuse, the parents' attitudes, Mother's attempts at deception, and the parents' lack of empathy or remorse. The social worker was also concerned that the parents would not benefit from services based on the parents' prior completion of a parenting class and substance abuse counseling.

The social worker further noted that D.J. was in need of counseling and an assessment for medications. Since being in foster care, the child had stated that he wanted to die, and he had purposely urinated on his bed and the floor, and was banging

his head against the wall. D.J. had also hit his younger sisters and other children, and he had stolen at school and walked out of his classroom. The social worker recommended moving D.J. to a home separate from his sisters; however, the foster parent, who was experienced with caring for children with behavioral and emotional issues, indicated that she would work with the child so he did not have to be moved.[4]

The contested jurisdictional hearing was held on January 30, 2013. At that time, Mother's counsel, before any witnesses were called, requested that the juvenile court speak to the two older children, then eight-year-old D.J. and then five-year-old Z.W., in chambers to discuss their wishes. Mother's counsel also specifically stated, "I don't really want to call them as witnesses. I don't think they need that experience." CFS offered to stipulate as to the children's wishes, but Mother's counsel confirmed that she wanted the court to hear from the children personally.

The court thereafter questioned D.J. and Z.W. with their counsel present. The children indicated that they wanted to return to their parents' care and that they wanted to visit J.W. However, they did not understand why they were taken from their parents' care. Additionally, in response to minors' counsel's question of what he thought would happen to him if he got in trouble again, D.J. stated that he would have to "stand at the wall" and that he did not believe J.W. would use "the switch" again because J.W. had told him that day that they would have "lots of fun" when they got home. Z.W. stated that if she got in trouble again, she would "hold the wall, and they [would] whoop me

---

[4] D.J. had to eventually be moved to another foster home due to him hitting his sisters.

with the metal part of the belt." Minors' counsel also asked whether D.J. and Z.W. had anything else they wanted to tell the judge, and Z.W. asked, "What judge?" Minors' counsel replied, "This is the judge. Did you know that?" Z.W. responded, "Okay. [¶] Can I have some ice cream?" D.J. stated that he would like visits with his dad.

Thereafter, with all the parties present, the court noted that the children desired visits with their mother and Father and that they wanted to go home, but that it was clear that neither child understood why the case existed or whether they understood the judge's role. The court offered to have the reporter read back the transcript of the interview if any party desired, but no one asked to have it repeated.

The social worker thereafter testified. In relevant part, the social worker stated that Mother had regularly visited with the children two times a week for two hours; that the visits appeared to have gone well; that the children enjoyed seeing their mother; and that Mother had began attending parenting and anger management classes. In response to the court's inquiry of whether offering services to the parents would be in the children's best interest, the social worker noted that he was "torn" because of the "shocking" abuse. The social worker explained that while the children were bonded with the parents and they wanted to return home, the social worker believed that it would be detrimental to the children to offer services to the parents given Mother's dishonesty with CFS and the police, Mother's failure to protect, Mother's own abuse of the children, the severity of the abuse, the history of domestic violence, and the fact that Mother remained in a relationship with J.W. after the abuse. Mother then briefly took the stand but chose to

8

exercise her Fifth Amendment right and refused to testify about the events that took place on the day D.J. was beaten due to the criminal charges against Mother and J.W.

Following arguments from counsel, the court found the allegations in the petitions to be true. In regards to D.J., the court added another section 300, subdivision (a), allegation indicating that J.W. had whipped D.J. with an electrical cord and that Mother had consented to the child being whipped with the electrical cord. The court denied reunification services to both parents under section 361.5, subdivision (b)(6). The children were declared dependents of the court and maintained in their foster home. The section 366.26 hearing was set for May 30, 2013." (*W. J. v. Superior Court, supra,* at pp. 2-8.) Mother's petition for extraordinary writ was denied. (*Id.* at p. 19.)

*B. In re J.W., Case No. E059321*

In the interim, on April 15, 2013, J.W., Jr. came to the attention of CFS when mother brought him to a supervised visit with D.J., Z.T.W., and Z.E.W., immediately after J.W., Jr.'s birth. On May 8, 2013, CFS initiated a dependency to protect J.W., Jr. from the issues that gave rise to the siblings' dependencies, and placed J.W., Jr. in foster care with his sisters. The juvenile court sustained the section 300 petition. At the disposition hearing, the court ordered FR services for the parents. Counsel for J.W., Jr. filed an appeal, objecting to the FR services order, which we addressed in case No. E059321.

In case No. E059321, we opined that the parents made minimal efforts in their case plans; the abuse of D.J. was serious; the parents had a long history of repeated child abuse; J.W., Jr. was not significantly bonded to the parents; and it was unclear that the

9

parents could provide him with stability and continuity of care. Given the severe physical abuse inflicted on D.J., we held that substantial evidence did not support the court's finding that it was in J.W., Jr.'s best interests to offer the parents FR services. Therefore, we reversed the lower court's order granting FR services to the parents. (*In re J.W.* (June 5, 2014, E059321) [nonpub. opn.], 15-23.)

*C. The Current Appeal*

The social worker's May 30, 2013, section 366.26 report requested a 120-day continuance to allow CFS to assess relatives for placements, and place D.J., Z.T.W. and Z.E.W. together in a concurrent planning home; D.J. was in a separate foster home because of his aggression and impulsivity. D.J.'s behavior improved, but he believed that he deserved the physical abuse Father imposed on him. Z.T.W. was five, and Z.E.W. was one and one-half years old. Both the sisters functioned within normal limits, and were healthy, emotionally fit, and happy.

At the section 366.26 hearing on May 30, the juvenile court trailed proceedings to June 27, to shadow J.W., Jr.'s case, which was pending resolution of jurisdiction and disposition.

In the June 27, 2013, section 366.26 addendum report, the social worker indicated that relatives interested in placement of the children were not likely to be protective of them. The social worker opined that the children were adoptable, but requested a 120-day continuance to further assess relatives, and place the children together. CFS contemplated placement in a non-family adoptive home.

10

At the hearing on June 27, the trial court set a further section 366.26 hearing for October 24, 2013.

In the October 24, 2013, section 366.26 addendum report, the social worker reported that relatives were unsuitable for placement of the children. Moreover, the size of the sibling set and D.J.'s behavioral issues also made it difficult to place the siblings together. The girls progressed behaviorally. Z.E.W., however, threw temper tantrums and cried, especially after parental visits.

At the hearing on October 24, the juvenile court set a further section 366.26 hearing for February 20, 2014, to allow CFS to find an adoptive home for the siblings.

On January 13, 2014, the court approved a packet request by CFS, authorizing CFS to list the children for adoption on the California Kids Connection internet site.

In the February 20, 2014 update, the social worker indicated that D.J. was suspended from school for unruly conduct. His psychiatric medication for his hyperactivity was increased, and he engaged in wraparound services. The sisters were doing well and attached to their foster mother, Mrs. L., who wished to adopt them, and J.W., Jr.

At the February 20 hearing, the court set a further hearing date for May 21, 2014, to allow CFS to place the children together in a concurrent planning home.

In an addendum report, the social worker indicated that the internet posting on Kids Connection generated inquiries from four families interested in adopting the children. However, two declined placement upon learning of a possible fourth sibling. The homes were also out of state, so moving the sisters would separate J.W., Jr. from his

11

sisters; J.W., Jr. and the sisters shared a strong bond. Mrs. L. was still interested in having D.J. placed with her, and adopting the children. CFS was working on obtaining a licensing exemption to allow a fourth child, D.J., to be placed with Mrs. L. The social worker recommended termination of parental rights for the sisters and Planned Permanent Living Arrangement (PPLA) for D.J., with an apparent goal of adoption. At this time, J.W., Jr. was not addressed as a proper subject of adoption since the parents were still receiving FR services. [5]

On May 21, the juvenile court continued the case to July 9, 2014, in order for CFS to provide an adoption assessment report. The court permitted CFS to facilitate visits with D.J. at Mrs. L.'s home, where the sisters and J.W., Jr. were placed.

The social worker's July 9, 2014, addendum report requested another 60-day continuance because the exemption allowing D.J.'s placement with Mrs. L. was pending. D.J.'s overnight visits with Mrs. L. were reportedly going well. CFS recognized that Mrs. L. was the most appropriate adoptive parent for the sisters. The sisters were placed with Mrs. L. for about 18 months and developed a strong and loving relationship with Mrs. L. The sisters considered Mrs. L. their parental figure and called her "mom." They had a secure and loving environment. D.J. was excited to be placed with Mrs. L., too.

Mrs. L. passed clearances for placement. She was in her thirties, had an associate's degree, and was employed. She was reportedly healthy and denied using controlled substances. Mrs. L. was married in 1996, but separated for five years. She

---

[5] At this time, our opinion – which reversed the FR order – was not yet filed. The parents, therefore, were receiving FR services for J.W., Jr.

12

was working on obtaining a divorce, but found it difficult because her husband was out of the country. Mrs. L. and her estranged husband had two children together, a teenage son and daughter; both resided with Mrs. L. along with Z.T.W., Z.E.W., and J.W., Jr. Mrs. L. was committed to meeting the needs of Z.T.W., Z.E.W., and D.J. on a permanent basis, and to adopting the sisters and J.W., Jr. She appeared stable, nurturing and honest. CFS opined that it was in the best interest of the children to be adopted by Mrs. L.

At the hearing on July 9, the juvenile court expressed concern about the delay in the case. Counsel for CFS stated that the hold-up was the licensing exemption allowing D.J.'s placement with Mrs. L. The court set a further hearing for September 8, 2014.

The September 8, 2014, addendum report noted that the sisters were young, healthy and adoptable. CFS awaited the licensing exemption to allow D.J.'s placement with Mrs. L, but a complaint by Father alleging that Z.E.W. was bit by the family dog led to Mrs. L.'s home being placed on "hold" by the licensing personnel, even though CFS determined that the dog did not bite Z.E.W. CFS recommended PPLA for D.J., and termination of parental rights to Z.T.W. and Z.E.W. to allow adoption of the girls by Mrs. L.

At the hearing on September 8, the parents objected to the recommendations. The court set trial for October 8, 2014.

The social worker's October 9 addendum report stated that D.J. was nine, Z.T.W. was six, and Z.E.W. was almost three years old. The licensing exemption came through. Therefore, D.J. was placed with Mrs. L. on September 12, 2014. Mrs. L. felt it was too

13

early to say whether she would adopt D.J.  The social worker observed the siblings; they enjoyed each others' company.

Moreover, the social worker reported that Father's abusive conduct toward Foster Family Agency staff at visits upset the children.  The parents also showed up late to visits, and occasionally missed or cancelled visits.  A couple of the visits were canceled due to court conflicts.  The visitation logs indicated that the children were comfortable with the parents and enjoyed the visits.

On September 22, 2014, Mother filed a section 388 petition requesting the return of D.J., Z.T.W., and Z.E.W. to her care, or more visits and FR services.  Mother contended that the children would be better served with that outcome because CFS had looked for an adoptive placement since January 2013, and recommended adoption for the sisters, but not D.J.  Mother felt that D.J.'s poor behavior would cease if the children were returned to her.  She also stated that she attended weekly visits with the children.  The children enjoyed seeing Mother, loved her, and wanted to live with her.

Mother's section 388 petition also stated that Mother had completed a 10-week batterer's course on October 2, 2013, a parenting course on March 6, 2013, and an anger management class.  The evaluators from the batterer's program held unclear credentials, but gave Mother mostly "4's" on a scale of 1 to 5, indicating that she "often" participated, was sober, and accepted responsibility.  However, it was unclear what was covered in sessions, and a substantive assessment of Mother's progress was not provided.  Moreover, Mother was reportedly making progress in therapy, but she had not tested for substances in 2014, contending that she had housing or transportation issues.

14

On September 23, 2014, Father also filed a section 388 petition. Father argued that FR services provided to him would best serve the sisters because Father maintained regular visitation and had a loving attachment with them. Father completed two domestic violence programs, an anger management and parenting program, and participated in therapy, and substance abuse treatment and testing. The petition included proof of Father's attendance at AA meetings from August 2013 to November 2014, apparently connected to probation.

A checklist from Father's batterer's program, dated October 2, 2013, was prepared by the same evaluators, with unclear credentials, who evaluated Mother. Father received the same ratings as Mother, and the evaluators did not provide a substantive assessment of Father's progress. However, Father attended therapy. His therapist, a Marriage and Family Therapist Intern (MFTI), provided progress reports on Father. According to the MFTI, Father minimized his actions leading to CFS intervention, and talked about inequalities, discrimination, and racism. Father had trust issues, which hindered therapeutic rapport, and had difficulty talking about the physical abuse. Father, therefore, did not accomplish his treatment goals of addressing physical abuse, domestic violence, and substance/drug abuse.

In a written response to the section 388 petitions, the social worker reported that Father was employed, working temporary jobs. Father's first therapist stated that Father was making progress and accepting responsibility for his actions. The second therapist, however, concluded that Father did not accomplish his treatment goals. On August 20, 2014, Father's services were also terminated in J.W., Jr.'s case. Father was out of jail on

15

a bail bond, with pending charges for abusing D.J. D.J. was placed with his siblings and hoped to be adopted by Mrs. L.

The sisters were very bonded with Mrs. L. and adjusted to her home, which was safe and stable. The sisters called Mrs. L. "mom." Z.T.W. was doing exceptionally well in school. D.J. responded well to Mrs. L. Historically, Mother reportedly physically abused D.J., causing injuries, bleeding, and scarring. Moreover, D.J. witnessed his parents beat Z.T.W. with a belt and electric cord. Z.T.W. confirmed the parents' use of a belt on her. Mother remained in strong denial about the severity of the abuse of the children. One therapy report stated that Mother was beginning to address her goals. Another report, however, stated that Mother minimized her role in the children's removal. Mother missed seven drug tests. She was out of jail on a bail bond, facing criminal charges for abusing D.J. Her services were terminated in J.W., Jr.'s case. The sisters were in placement for nearly two years. FR services to the parents would delay the children's need for permanency.

On October 9, 2014, the juvenile court received into evidence the section 366.26 reports and addendums, and the section 388 petitions. The court believed that the section 388 petitions lacked prima facie cases, but allowed a hearing to address the section 366.26 and section 388 issues.

At the hearing, social worker Hernandez testified that she was assigned to the case in January 2013. Mother told Hernandez that Mother missed random testing because she resided in Las Vegas and Barstow. However, Mother never asked to test in Las Vegas, and did not tell Hernandez when she was in Las Vegas. Mother visited the children.

16

Hernandez was informed that the children were happy to see Mother, but they acted out after the visits. According to Hernandez, Mother attended eight therapy sessions with one therapist, six with a second therapist, and one with a third therapist in July. Mother indicated she was not living with Father.

Father testified that he visited the girls weekly for one hour for the past three months. Prior to that, his visits were two hours. Father admitted to missing visits, but contended that some were cancelled when he arrived late. Father testified that he had a warm, fun, and loving relationship with the girls. Father contended that the girls recognized him as their parent; they were a bit clingy, hugged him, and called him "daddy." Father also stated that the girls wanted to come home. He also testified that they had cried at the end of the last three of the four visits with him. Father opined that the girls were bonded with him.

Mother's counsel and Father's counsel argued that the court should grant the section 388 petitions. They both suggested that the beneficial relationship exception to adoption applied between the sisters and parents. Minors' counsel and CFS's counsel disagreed, and asked that the court follow the recommendations set forth by CFS.

After hearing argument, the juvenile court stated that the evidence did not come close to demonstrating a change of circumstances, or that further services of a lesser plan than adoption were warranted. The court denied the petitions. It found by clear and convincing evidence that the sisters were adoptable, terminated parental rights as to the girls, and estimated that the adoption would likely be finalized in 12 months. Concerning

17

D.J., the court established PPLA with a goal of adoption by Mrs. L. as the appropriate permanent plan.

On October 9, 2014, Mother and Father filed separate notices of appeal. They both object to the termination of parental rights as to the sisters Z.T.W. and Z.E.W. D.J. was not included in the notices of appeal. Therefore, the sisters are the only subjects of this appeal.

III

DISCUSSION

*A. The Juvenile Court Properly Denied the Section 388 Petitions*

Both Mother and Father contend that the trial court erred in denying their section 388 petitions.

This court reviews a trial court's decision on whether to grant a section 388 petition for abuse of discretion. The judgment below will not be disturbed except on a showing that the court made the determination in an arbitrary, capricious, or patently absurd manner. "'"'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.)

A parent may seek to modify a court order by filing a section 388 petition alleging changed circumstances or new evidence, and that the proposed modification is in the child's best interest. (§ 388, subd. (a); *In re Jasmon O.*, *supra*, 8 Cal.4th at pp. 414-415.) A parent's burden of proof with a section 388 petition, where a section 361.5, subdivision

18

(b)(6), bypass was applied at disposition, is clear and convincing evidence that the proposed change or order serves the child's best interests. (§ 388, subd. (a)(2).) "'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] "'[C]hildhood does not wait for the parent to become adequate.'"'" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206, quoting *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

### 1. *Changed circumstances*

We first address Mother's petition. In her petition, Mother requested return of the children or increased visitation, and FR services. She completed a 10-week batterer's course, a parenting course, and an anger management class. Mother, however, failed to address domestic violence and substance abuse issues.[6] Moreover, both parents imposed excessive discipline on the children, and Mother consented to Father's severe physical abuse of D.J. Although Mother attended a batterer's program, her valuators had unclear credentials, and used a simple rating scale to demonstrate her progress, without specifying what was covered in the program, or the basis for such ratings.

---

[6] Father was reportedly always smoking crack and drunk before the children were removed from parental custody. Section 300 allegations were sustained addressing his substance abuse, but not Mother's. Mother's pre-dispositional case plan, however, required her to randomly substance abuse test. Failures to test are considered positive results, requiring attendance in a substance abuse treatment program.

19

Furthermore, a social worker opined that Mother was in strong denial about the severity of the abuse of her children. Also, while one therapy report indicated Mother was "beginning" to address her issue, another one stated that Mother minimized her role in the children's removal. In our opinion in *In re J.W.*, *supra*, at pp. 17-18, 20, we noted that both parents had made some effort to address their issues, but their progress was minimal, at best. This was one of the reasons why we reversed the dispositional order of FR services in that case. (*Id.* at p. 23.)

Therefore, at best, Mother's circumstances were changing, which is insufficient under section 388. Mother failed to prove *changed* circumstances by clear and convincing evidence, applicable in this FR bypass case. (§ 388, subd. (a)(2).)

Next, we address Father's petition requesting FR services for the sisters. Father completed two domestic violence programs, an anger management and parenting program, and participated in therapy, substance abuse treatment, and testing. Father demonstrated that he attended AA meetings from August 2013 to November 2014, but not that he attended substance abuse treatment and testing. Sustained allegations addressed Father's substance abuse. He reportedly smoked crack and was drunk. Father's section 388 petition, however, failed to indicate how Father addressed his substance abuse and was now sober.

Moreover, just like Mother, Father attended a batterer's program, but his evaluators had unclear credentials. They also used a simple rating scale to demonstrate Father's progress, without specifying what was covered in the program or the basis for such ratings. His therapist, an MFT intern, concluded that Father did not meet his

treatment goals to address physical abuse, domestic violence, and substance abuse.  Also, in our opinion in *In re J.W.*, we noted that Father made minimal progress in services; one of the reasons for reversing the disposition FR order.  (*In re J.W.*, *supra*, at pp. 17-18, 20, 23.)

Historically, Father imposed severe physical abuse on D.J. During therapy, Father failed to take responsibility for his actions or express remorse. Father could have done so when testifying, but did not.  And, like Mother, Father was out of jail, on bail, pending a criminal trial for his abuse of D.J., subject to re-arrest.  A court order for FR services would have put the children in limbo, contrary to the law.

Like Mother, Father failed to demonstrate changing circumstances, let alone changed circumstances.

### 2. *Best interest of the children*

In addition to the lack of changed circumstances, both parents also lacked evidence in their section 388 petitions that their requests served the best interests of the children.  When considering whether granting the requests would serve a child's best interests, there are three factors to consider:  (1) the seriousness of the problem that led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretaker; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)  After FR services are terminated, the focus shifts.  The best interest of the child and child's

need for a permanent and stable home are paramount. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

As to the first factor, the seriousness of the problem which led to the dependency, both parents were responsible for severe physical abuse of D.J. The parents, however, lacked empathy for D.J.'s pain and suffering. Moreover, both parents physically abused the children. Both were arrested on felony child abuse charges. Father was known to smoke crack, get drunk, and engage in domestic violence with Mother. The issues at bar were all serious, and continued because the parents failed to benefit from services.

The second factor requires analyzing the strength of bonds between the children and caretakers, and the children and the parents. In November 2012, when the sisters were removed from parental custody, Z.T.W. was nearly five and Z.E.W. was nearly one. The sisters enjoyed supervised visits with the parents. Father testified that he had a warm, fun, and loving relationship with the sisters. However, by October 9, 2014 – the date of the section 388 and section 366.26 hearings – the sisters had resided with Mrs. L. for nearly two years. They were now almost seven and three. The sisters are bonded with Mrs. L. and call her "mom." The sisters acted out after visiting with their parents.

The third factor involves addressing the degree to which the problem may be easily ameliorated, and the degree to which it actually has been. Again, as stated above, this dependency involved severe child abuse, parental domestic violence, and substance abuse. The issues were not easily ameliorated because the parents lacked remorse for their conduct, and for the most part, failed to acknowledge any child-safety issues exist.

22

They failed to benefit from services. Their issues, therefore, were minimally ameliorated, if at all.

Application of the three factors enumerated in *In re Kimberly F.* demonstrates that Mother's request for placement, and alternatively, the parents' request for FR services, did not meet the children's best interests. This is especially clear given that the parents must prove best interest by clear and convincing evidence since this is an FR bypass case. (§ 388, subd. (a)(2).)

"There is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers . . . . To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification." (*In re Angel B., supra,* 97 Cal.App.4th at p. 465.)

In this case, the sisters are served well by remaining in placement with Mrs. L., their long-term caretaker, under a plan of adoption, rather than remaining in limbo hoping the parents will reform. Mother's request for placement was not viable. She was out of jail on bail, facing serious charges, and subject to re-arrest.

In sum, at the hearing on the section 388 petitions, the juvenile court heard and evaluated the testimony of a social worker and Father, and considered the assessment reports prepared for this case, the social worker reports, the section 388 petitions and responses to the section 388 petitions. Thereafter, the court denied both section 388 petitions to modify.

The court noted, "[a]s to each of the 388s, frankly, I don't find any of the issues in this case close in this matter." The court went on to note, "[w]hether it was a standard preponderance of the evidence or clear and convincing evidence to grant the 388, I certainly don't find or make the preponderance test, let alone the 388 petition." The court specifically noted that there was a lack of parental bond between the sisters and parents.

Based on the juvenile court's thoughtful decision, we cannot say that the decision was arbitrary, capricious, or absurd. In fact, it was well within the bounds of reason. Neither parent has failed to demonstrate that the court abused its discretion. Based on the facts discussed above, we cannot say that the trial court abused its discretion in denying both parents' section 388 petitions.

*B. The Parental Bond Exception to Adoption Did Not Apply*

Both Mother and Father argue that the juvenile court erred when it terminated their parental rights to the sisters because there was insufficient evidence to support the court's failure to find the parental bond exception to the preference for adoption existed.

In general, at a section 366.26 hearing, if the juvenile court finds that a child is adoptable it must terminate parental rights. (§ 366.26, subds. (b)(1), (c)(1).) This rule, however, is subject to a number of statutory exceptions (§ 366.26, subds. (c)(1)(A), (c)(1)(B)(i)-(vi)), including the beneficial parental relationship exception, which applies when "termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]"  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235.)

"'[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' [Citation.]"  (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.)  The parent must show more than frequent and loving contact or pleasant visits.  (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 229.)  "'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.  [Citation.]  A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree,* but that does not meet the child's need for a parent.' [Citation.]"  (*In re Jason J*., *supra*, at p. 937.)

"The parent contesting the termination of parental rights bears the burden of showing both regular visitation and contact and the benefit to the child in maintaining the parent-child relationship.  [Citations.]"  (*In re Helen W*. (2007) 150 Cal.App.4th 71, 80-

25

81.)  This court must affirm a juvenile court's rejection of these exceptions if the ruling is supported by substantial evidence.  (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 809.) We review "the evidence most favorabl[e] to the prevailing party and indulg[e] in all legitimate and reasonable inferences to uphold the court's ruling.  [Citation.]"  (*In re S.B*. (2008) 164 Cal.App.4th 289, 297.)  Because Mother had the burden of proof, we must affirm unless there was "indisputable evidence . . . [in her favor, which] no reasonable trier of fact could have rejected . . . ."  (*In re Sheila B*. (1993) 19 Cal.App.4th 187, 200.)

Both parents argue that they visited regularly and consistently.  The record, however, shows that the parents occasionally showed up late to the visits, and missed or cancelled visits.  Father even testified that he missed visits; some were cancelled when he was late.  Mother claimed she lacked housing and had transportation issues, and resided between Las Vegas and Barstow.

Even if both parents visited regularly and consistently, the beneficial parental relationship exception requires *both* regular visitation *and* benefit to the child.  Here, the parents have failed to establish benefit to the children.

A court must select adoption as the permanent plan unless it finds there is a compelling reason for determining that termination of parental rights would be detrimental to the children.  (§ 366.26, subd. (c)(1)(B)(i).)  The parents have failed to show that severing the natural parent-child relationship would deprive the children of a substantial, positive emotional attachment such that they would be greatly harmed.  (*In re Angel B., supra,* 97 Cal.App.4th at p. 466.)  The required compelling reason for a finding of detriment, i.e., evidence the children would suffer great harm, is absent.

26

In fact, the evidence shows that maintaining the relationship between the girls and parents did not promote the children's well-being to such a degree as to outweigh the well-being they would gain in a permanent home with their new adoptive parent. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.)

In this case, Z.T.W. was five and Z.E.W. was almost one when they were removed from parental custody. They were placed with Mrs. L. in January 2013. When parental rights were terminated in October of 2014, Z.T.W. was almost seven years old and Z.E.W. was almost three. The sisters had lived almost two years of their young lives with Mrs. L. In fact, Z.E.W. lived most of her life with Mrs. L. They had a loving and stable relationship with Mrs. L.; Mrs. L. wanted to adopt the sisters. The home was free from negative effects of substance abuse, from physical abuse, and from domestic violence. Mrs. L. loved the children and was a fit parental figure. The girls are bonded with Mrs. L. and call her "mom." The stability, love and permanency provided by Mrs. L. far outweigh maintaining a relationship with the parents.

*In re Melvin A.* (2000) 82 Cal.App.4th 1243, does not support Father's argument. In that case, the court stated that the child must be *greatly harmed* with severance of the parental relationship to overcome the preference for adoption. (*Id.* at p. 1254.) Here, the girls were positively attached to Mrs. L. and thriving in her care. Therefore, there is nothing in the record to indicate that the girls would be greatly harmed with the termination of Father's parental rights. Also, in *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, the court held that the juvenile court did not err in failing to apply the beneficial relationship exception where the children looked to their caregiver as their parental

27

figure.  (*Id.* at pp. 1417-1421.)  Here, the girls are positively bonded with Mrs. L., call her "mom," and look to her as their parental figure.

Mother also tries to use D.J.'s PPLA as a justification for a lesser plan than adoption for the girls.  However, as stated above, adoption is the preferred permanent plan.  One sibling's interests may not be used to defeat adoption of other siblings.  (*In re Celine R.* (2003) 31 Cal.4th 45, 54, 61-62.)  Moreover, in this case, D.J. has been placed with Mrs. L. along with his sisters.  Therefore, any sibling bond exception does not apply.  (*In re B.D., supra,* 159 Cal.App.4th at pp. 1236-1237 [sibling-bond argument is moot once siblings are placed in same household].)

In sum, the parents have the burden to establish the applicability of the beneficial parental relationship exception in the lower court; on appeal, they have the burden of showing that the juvenile court's ruling was an abuse of discretion.  We conclude that the parents have failed to meet this burden.

### C.  The Children Are Adoptable

Father argues that the section 366.26 order terminating parental rights must be reversed because the children are not adoptable.  Father claims that he may challenge the juvenile court's adoptability finding for the first time on appeal, while the People claim that Father has forfeited this claim by failing to object in the lower court.  We need not decide the issue of forfeiture because Father's argument fails on the merits.

The juvenile court cannot terminate parental rights unless it finds by clear and convincing evidence "that it is likely the child will be adopted . . . ."  (§ 366.26, subd. (c)(1).)  The focus of the adoptability inquiry is on the child, "and whether the child's

28

age, physical condition, and emotional state may make it difficult to find an adoptive family. [Citations.]" (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400; see also *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) A proposed adoptive parent need not be identified and ready to adopt, but "there must be convincing evidence of the likelihood that adoption will take place within a reasonable time. [Citation.]" (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292 [Fourth Dist., Div. Two].)

"'"Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*."' [Citation.]" (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562; see also *In re I.W.* (2009) 180 Cal.App.4th 1517, 1526.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child[ren] [were] likely to be adopted within a reasonable time." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) It is the parent's "'burden of showing there is no evidence of a sufficiently

29

substantial nature to support the finding or order.' [Citation.]" (*In re Jose C.* (2010) 188 Cal.App.4th 147, 158.)

Here, Father appears to be arguing that Z.T.W. and Z.E.W. are not adoptable because an adoptive family may not be willing to take the "sibling set." In this "sibling set," the Father seems to be including D.J. and J.W., Jr. However, the only finding of adoptability at issue on this appeal relates to the two sisters, Z.T.W. and Z.E.W. In this case, the evidence showed that Z.T.W. and Z.E.W., who are young, in good health, and functioning within normal limits, are generally adoptable. When CFS posted the girls on an adoption internet site, there were four families interested in adopting them within five months of the posting. A finding of adoptability must be supported by clear and convincing evidence, but it is nevertheless a low threshold: The court must merely determine that it is "likely" that the child will be adopted within a reasonable time. (*In re K.B., supra,* 173 Cal.App.4th at p. 1292.) Father has failed to meet his burden to show that there is no evidence of a sufficiently substantial nature to support the adoptability finding as to the two sisters. Father's argument, therefore, lacks merit.

Moreover, as noted above and acknowledged by Father, even children who ordinarily might be considered unadoptable may be found to be adoptable because a prospective adoptive family has been identified as willing to adopt the children. (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408.) In this case, Mrs. L., the foster mother of the sisters, has been identified as willing to adopt the two sisters. Nonetheless, Father argues that "when such children are deemed adoptable based solely on a particular

family's willingness to adopt them, the juvenile court must determine whether there is a legal impediment to adoption. (*In re B.D.*, *supra*, 159 Cal.App.4th at p. 1232.)"

Here, Father argues that there is a legal impediment to the sisters being adopted by Mrs. L. because she is working on obtaining a divorce from her husband, who resides outside of the country. Under Family Code section 8603, "[a] married person, not lawfully separated from the person's spouse, may not adopt a child without the consent of the spouse, provided that the spouse is capable of giving that consent." The statute presents a legal impediment to adoption: if the prospective adoptive parent's spouse does not consent, the prospective adoptive parent cannot adopt the children. (*In re G.M.* (2010) 181 Cal.App.4th 552, 561.) Here, the record indicates that Mrs. L. has been separated from her husband, who resides outside of the United States. However, the record is silent as to whether Mrs. L.'s husband would consent or not consent to Mrs. L.'s adoption of the children. No evidence on this issue was proffered at trial and the court made no finding on this point.

The Court of Appeal in *In re G.M., supra,* 181 Cal.App.4th 552, was presented with a similar situation. In that case, a married aunt of the children was identified as the prospective adoptive parent. (*Id.* at pp. 557-558.) The social worker's adoptability assessment raised a question about the aunt's marital status. (*Id.* at p. 558.) However, the record was "silent regarding whether the aunt was lawfully separated or she had secured or could secure her husband's consent to her adopting the children." (*Id.* at p. 560.) On appeal, the children's mother argued that the trial court should have considered whether there was a legal impediment to the aunt's adoption of the children. (*Ibid*.)

31

Initially, the *In re G.M.* court stated that "evidence of a legal impediment to adoption under the Family Code by an identified prospective adoptive parent is relevant when a social worker's opinion that a dependent child will be adopted is based in part on the willingness or commitment of an identified prospective adoptive parent." (*In re G.M., supra,* 181 Cal.App.4th at p. 562.) Thus, the mother could have asked the social worker or the aunt "about whether the aunt was lawfully separated or had or could obtain her husband's consent to an adoption. The court in turn could have considered any evidence on the subject in evaluating whether it was likely the children would be adopted within a reasonable time. [Citation.]" (*Id.* at p. 563.) The problem with the mother's argument on appeal, the *In re G.M.* court explained, was that she did not adduce any such evidence at trial. (*Ibid*.) "Having not raised the legal impediment question in the trial court, mother failed to properly preserve for appellate purposes her claim of trial court error. [Citations.] She also did not object to the department's preliminary assessment as inadequate in this regard and thus forfeited the opportunity to now place the blame for the silent record on the department." (*Id.* at pp. 563-564.)

Here, like the mother in *In re G.M.*, Father failed to raise in the trial court any issue regarding a legal impediment to Mrs. L.'s adoption of the sisters, and offered no evidence or argument relevant to the issue. Nor did he object to CFS's preliminary assessment of Mrs. L. in this regard. He has, therefore, forfeited the issue on appeal.

Notwithstanding, even if Father did not forfeit the legal impediment argument, as the People point out, the issue is not applicable because substantial evidence supports a

general finding of adoptability. The sisters' adoptability does not rely solely on Mrs. L.'s willingness to adopt them. Therefore, the legal impediment issue does not apply.

Because Father has forfeited the legal impediment argument and failed to establish that there is insufficient evidence to support the court's adoptability finding, we reject his arguments and affirm the court's orders.

## IV

## DISPOSITION

The order denying the section 388 petitions and the judgment terminating Mother and Father's parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
                                                                                                    J.

We concur:


RAMIREZ
            P. J.


CODRINGTON
            J.